**IN THE COURT OF APPEALS OF IOWA**

No. 25-1159
Filed October 1, 2025

**IN THE INTEREST OF L.C.-J.,**
**Minor Child,**

**L.J., Father,**
       **Appellant.**
_____

Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

A father appeals termination of his parental rights to one child. **AFFIRMED.**

Michael M. Lindeman of Lindeman Law, Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Robert Davison, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**BULLER, Judge.**

The father appeals termination of his parental rights to a child born March 2024. The mother does not appeal. After considering the juvenile court's detailed fact- and credibility-findings, we affirm.

**Background Facts and Proceedings.** This family first came to the attention of the Iowa Department of Health and Human Services (HHS) when the child tested positive for tetrahydrocannabinol (THC) at birth. That case was founded and addressed with voluntary services when, in May, HHS received reports that both parents were using methamphetamine and the father had assaulted his father in the presence of child (then two months old). This report was also founded.

The child was safety-planned to the paternal aunt and uncle, and the parents agreed to drug test. Five days later, without drug-testing as they had agreed, the parents attempted to withdraw their consent to the safety plan. The father's siblings told HHS the parents had admitted to using methamphetamine. And the parents took home drug tests, which indicated methamphetamine and THC use. The mother disclosed to HHS that she and the father had used methamphetamine. And the father minimized the substance abuse by emphasizing that his siblings were watching the child while he and the mother "were intoxicated for the whole weekend."

The child was formally removed and placed with the paternal aunt and uncle, where she has remained. She was adjudicated in need of assistance that same month.

Throughout the case, the father claimed he only used methamphetamine once while partying. The juvenile court discredited this claim, reasoning it was inconsistent with the father's positive hair-stat test, which is generally indicative of long-term use. And the father admitted to regular marijuana use, though he claimed to be cutting back before trial.

The father ultimately complied with less than half of the court-ordered drug tests. He blamed this on a misunderstanding and claimed to have become "very compliant" after clarification, which the juvenile court expressly found "not . . . credible." In the juvenile court's words, the father "provided a litany of excuses to the professionals as to why he could not attend drug tests." An HHS worker testified that she also did not believe the father's claimed lack of understanding and follow-through, and she instead believed he was making a choice not to comply with requirements.

Of the father's completed drug tests, more than a dozen were positive for marijuana, one was positive for methamphetamine, and five were negative. After failing to obtain a substance-abuse evaluation for months, the father eventually obtained one, which recommended extended outpatient treatment weekly. The father participated in some sessions, but he wasn't consistent and continued to use marijuana. He denied struggling with substance abuse, despite this history. And both the father and the mother made accusations about the other using controlled substances, only to recant those statements upon further investigation.

A mental-health evaluation revealed the father had attention deficit hyperactivity disorder (ADHD) and an adjustment disorder with mixed disturbance of emotions and conduct. The evaluation recommended medication and therapy.

A psychiatric evaluation later concluded the father had problems with anxiety, depression, cannabis dependence, and ADHD. It also recommended medication management. The father did not stop using marijuana as his doctor recommended, which was necessary to take prescription medication to treat his ADHD. And he denied having any mental-health issues, despite all evidence to the contrary. The father attended medication management appointments but did not consistently attend therapy. His provider eventually required additional engagement classes because of his chronic absences.

Various reports generally attributed parenting problems to both parents. For example, HHS documented concerns about the parents sleeping through the child crying and not interacting enough with the child. Providers reached out four or more times to the parents to schedule parenting classes and never heard back.

HHS also had concerns about domestic violence perpetrated by both parents—but mainly with the father as the primary aggressor. The juvenile court made a fact-finding that the father's "control over [the mother] was noticeable during all of the court hearings" and that he "continuously blamed her" for his own inability to complete case expectations. The court observed that, when the father did this, "the mother . . . visibly shr[u]nk in her seat as he blamed her over and over." In the court's words, "It was incredibly sad and concerning."

There was also evidence that the father was verbally and physically aggressive with his parents and other family members. For example, while the juvenile case was pending, the father pled guilty to disorderly conduct after drunkenly fighting his brother-in-law in the front yard.

Visits between the father and the child remained fully supervised as of trial. He attended just under half of all offered visits. When the supervising agency put him on a plan requiring confirmation for visits, the father told HHS he would rather stop the visits altogether than "go through that trouble" to confirm his attendance. The juvenile court made an adverse credibility finding regarding the father's offered excuses for missing visits. And as far as medical care for the child, collectively the parents only attended four out of more than a dozen pediatric appointments.

The father testified at trial. The juvenile court described his demeanor as "oppositional," and it reprimanded him for disrespectful and inappropriate behavior.[1] The court observed the father blamed everyone but himself for his parenting deficits. And the juvenile court again made credibility findings:

> It was obvious to the Court that the father had no desire to make any life changes to ensure he was a safe, sober parent for his daughter. None of his testimony was credible and his blame of others and his demeanor was indicative of his inability to parent his daughter at this time. His lack of credibility makes it impossible for the Court to believe his assertions that he is a sober, safe parent.

The court found the father had not made any meaningful progress toward the case plan goals or reunification.

The father's mother also testified at the termination trial, but the juvenile court found she too "made continuous excuses for her son's behaviors and diminished the severity of his outbursts." The court found the father's mother "was not credible as it was apparent that she had no insight into the concerns regarding [the father]'s violent behaviors and definitely minimized these behaviors." And, contrary to her portrayal of things in court, the mother had previously discussed

---

[1] To put it mildly, the father's testimony was often nonresponsive and combative.

the father's anger problems with the HHS worker—incidents like the father punching holes in walls and breaking doors. The incidents of violence were corroborated by the HHS worker's conversation with another family member. And, although the full reason why is never disclosed on the record, the father's mother refused to allow HHS into the home, even though that is where the father would be living with the child if she was returned to his custody.

The county attorney, HHS, and the child's guardian ad litem (GAL) all recommended termination of both parents' parental rights. The juvenile court terminated both parents' rights under Iowa Code section 232.116(1)(e) and (h) (2024). Only the father appeals, and we review de novo. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). While "not bound by the juvenile court's findings of fact," "we do give them weight, especially in assessing the credibility of witnesses." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

**Statutory Grounds.** The father first challenges the statutory grounds supporting termination. "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *A.B.*, 815 N.W.2d at 774. We focus on section 232.116(1)(h), and the only element the father challenges is whether the child could be safely returned to his custody as of trial. *See* Iowa Code § 232.116(1)(h)(4); *D.W.*, 791 N.W.2d at 707 (analyzing this element).

The main thrust of the father's appellate argument is that he was never violent with the child. But the law expects more from parents than abstention from violent child abuse. We agree with the juvenile court's detailed analysis, informed by credibility findings, that the father failed to meaningfully address his problems

with substance abuse, his mental health, domestic violence in the home, and parenting skills. His problems controlling his anger, perpetrating violence on his family, and destructive tendencies when angry—regardless of the presence of children—is amply demonstrated in this record. And we defer to the juvenile court's numerous detailed credibility findings regarding the father's failure to accept responsibility and his penchant for blaming everyone but himself, which reinforces that he has not adequately addressed any of the deficits that led to removal of the child in the first place. *See, e.g.*, *In re L.H.*, 904 N.W.2d 145, 153–54 (Iowa 2017) (finding acknowledgement of and addressing anger and domestic-violence issues to be an important aspect of a parent's care). As the juvenile court observed, "because [the father] continuously denied any issues, he did not engage in any services to enable him to make long-term lifestyle changes. Without those services to effect changes, it appears he is likely to continue a cycle of domestic violence and substance use issues." We agree and conclude the statutory grounds were proven by clear and convincing evidence.

**Best Interests.** The father's petition on appeal conflates a best-interests analysis with application of the permissive bond exception. Assuming without deciding he adequately presented a best-interests challenge, we reject it. On review, we give primary weight "to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We again agree with the juvenile court's analysis: the child needs a "safe, stable home free from substance abuse and domestic violence," and the father is "not in a position to provide [the child] with . . . stability and safety at this time."

**Permissive Bond Exception.**  At least some portions of the father's petition on appeal appear to invoke the permissive bond exception at Iowa Code section 232.116(3)(c).  But he did not obtain a ruling on this claim below, so we cannot consider it on appeal.  *See In re J.R.,* 20 N.W.3d 839, 843 (Iowa Ct. App. 2025) (en banc) (obviating the error-preservation requirement for the statutory grounds and best interests but not permissive exceptions).  However, in the interests of completeness, we note we would not reverse termination even if the bond-exception claim was preserved.  The father bore the burden to prove by "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship," and this record falls far short of that proof.  *See* Iowa Code § 232.116(3)(c).

**AFFIRMED.**